Steven J. **HATFILL,** M.D., Plaintiff,

v.

John **ASHCROFT,** et al., Defendants.

No. Civ.A. 03–1793(RBW).

United States District Court,
District of Columbia.

Sept. 16, 2005.

---

1. An Order consistent with this Memorandum Opinion is being issues contemporaneously herewith.

Thomas Gerard Connolly, Patrick Pearse O'Donnell, Tonya L. Mitchell, Mark Andrew Grannis, Harris, Wiltshire & Grannis, LLP, Washington, DC, for Plaintiff.

Richard Montague, Alan Stuart Modlinger, Elizabeth J. Shapiro, Glenn Stewart Greene, Serrin Turner, Paul Freeborne, U.S. Department of Justice, Kevin T. Baine, Kevin Hardy, Williams & Connolly LLP, Robert Charles Bernius, Laurin H. Mills, Leslie Paul MacHado, Nixon Peabody LLP, David A. Schulz, Adam J. Rappaport, Chad R. Bowman, Lee Levine, Nathan E. Siegel, Levine Sullivan Koch & Schulz, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

This action was filed by Steven J. Hatfill, a medical doctor who resides in the District of Columbia, against the United States Department of Justice ("DOJ"), the Federal Bureau of Investigation ("FBI") and several named and unnamed federal officials.[1] Dr. Hatfill alleges that the defendants have engaged in a campaign of harassment against him and have, as a result of their actions, violated his "constitutional rights, the Privacy Act, 5 U.S.C. § 552a, et seq., (1999) and DOJ, FBI, and U.S. Attorney regulations, policies, practices and standards." Compl. ¶ 11.[2] Currently before the Court is the Individual Defendants' Motion to Dismiss [D.E. # 21] for failure to state claims upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), the plaintiff's opposition to the motion and the Reply Memorandum in Support of the Individual Defendants' Motion to Dismiss. ("Defs.' Reply"). For the reasons set forth below, the defendants' motion will be granted in part and denied in part.

## I. Factual Background

The events that precipitated the filing of this lawsuit have received widespread media coverage. The events occurred in the fall of 2001, when letters containing the pathogen anthrax were mailed to several members of the press and two United States Senators, Senator Thomas A. Daschle and Patrick J. Leahy. The letters that were sent to the members of the press were mailed on or about September 18, 2001, while the Daschle and Leahy letters were mailed on or about October 9, 2001. Compl. ¶ 24. It appears that all of the letters were mailed at a postal mail box located in Princeton, New Jersey. Id. As a result of the mailings, five people who had contact with the letters died, many others became ill, and the American public

---

1. These officials include former Attorney General John Ashcroft; former FBI Supervisory Special Agent Van Harp (who is now retired); Timothy Beres, a DOJ employee who served as Acting Director of DOJ's Office for Domestic Preparedness; Daryl Darnell, a DOJ employee who worked for DOJ's Office for Domestic Preparedness; and several Unknown Employees of the DOJ and Unknown Agents of the FBI. The individual defendants are sued in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. References to "Compl." are to the complaint plaintiff filed on August 26, 2003.

was in a state of panic. *Id.* Subsequent to the mailings, the FBI launched a massive investigation, code-named "Amerithrax." Compl. ¶ 26. Investigators from the FBI interviewed "hundreds of scientists working in fields related to biological weapons[,]" which led them to Dr. Hatfill who "willingly cooperated with the FBI[,]" although he had never personally worked with anthrax. *Id.* ¶ 25. Dr. Hatfill was interviewed by the FBI "several times[,]" and he volunteered to take a polygraph examination to substantiate his representations that he had no involvement with the mailings, which he was later informed he passed. *Id.* The investigation has not definitively identified the person who mailed the letters, even though federal agencies have offered a reward and asked members of the microbiology field for leads that would potentially identify the culprit. *Id.* ¶ 26.

One such member of the microbiology field was Barbara Hatch Rosenberg, a Professor of Environmental Science at the State University of New York at Purchase, New York. *Id.* ¶ 27. According to Dr. Hatfill, professor Rosenberg determined that the sender of the anthrax mailings had to be someone who opposed her campaign to gain United States support for monitoring under the Biological Weapons and Toxin Convention, to which the United States was a party. *Id.* Dr. Hatfill fit professor Rosenberg's profile. *Id.* After unsuccessfully appealing to the FBI to continue its investigation of Dr. Hatfill, on June 18, 2002, Ms. Rosenberg attended a meeting with Senators Leahy and Daschle and FBI supervisory agent Van Harp, who was in charge of the anthrax investigation, during which she informed those present that she believed Dr. Hatfill was probably responsible for sending the anthrax laden letters. *Id.* ¶ 29.

According to Dr. Hatfill, as a result of the FBI's unsuccessful investigative efforts to identify a suspect, professor Rosenberg's suspicion caused the FBI's investigation to focus primarily on him. *Id.* ¶ 30. On June 25, 2002, Dr. Hatfill met with FBI agents from the Washington Field Office facility located in Frederick, Maryland, at which time he agreed to allow agents to conduct a search of his apartment in Frederick, Maryland. *Id.* ¶ 31. After giving his consent, Dr. Hatfill and several FBI agents drove to his apartment, and "Dr. Hatfill was astonished to see that his apartment complex was surrounded by news helicopters and television vans filming the search." *Id.* ¶ 32. Dr. Hatfill opines that the FBI had tipped off the media in advance of the search to demonstrate to the nation that it was making progress in its anthrax investigation. *Id.* Dr. Hatfill contends that such consensual searches are not typically conducted with such fanfare and that the government agents "deliberatively departed from standard procedure and deliberately violated [his] constitutional rights." *Id.* ¶ 33. Thereafter, in late July 2002, FBI Special Agent Bob Roth contacted Dr. Hatfill to request an interview. *Id.* ¶ 38. Dr. Hatfill referred this call to his civil attorney, Victor M. Glasberg. *Id.* Mr. Glasberg left a message for Agent Roth, stating that Dr. Hatfill would willingly cooperate, however, Agent Roth never responded to Mr. Glasberg's message. *Id.* ¶ 39. Instead, a search warrant was obtained, and on August 1, 2002, Dr. Hatfill's Frederick, Maryland apartment was again searched. *Id.* As was the situation when the first search was conducted, the media was again present, having been allegedly informed about the search in advance by government agents. *Id.*

Dr. Hatfill argues that the defendants' actions have resulted in his inability to retain or acquire employment. Specifical-

ly, prior to the June 25, 2002 search of his home, Dr. Hatfill had secured the position of associate director of the National Center for Biomedical Research and Training at Louisiana State University ("LSU") in Baton Rouge, with his appointment becoming effective on July 1, 2002. *Id.* ¶ 36. According to plaintiff, on approximately August 1, 2002, DOJ employee Daryl Darnell, contacted LSU personnel and stated that Dr. Hatfill should not be permitted to work on any DOJ funded projects. *Id.* ¶ 41. In addition, Timothy Beres, Acting Director of DOJ's Office for Domestic Preparedness, reinforced Mr. Darnell's admonition, through an e-mail sent to a person only identified as Mr. Guillot, Dr. Hatfill's supervisor at LSU, to "reiterate" that Dr. Hatfill should not be employed on any DOJ funded projects. *Id.* ¶ 42. Because Dr. Hatfill had been hired for the precise purpose of working on DOJ funded projects, these communications resulted in him being placed on 30–day administrative leave commencing on August 2, 2002, and eventually his termination at the end of this 30–day period. *Id.* ¶ 44. Dr. Hatfill contends that the communications from the DOJ's employees were made presumably with former Attorney General Ashcroft's full knowledge and consent. *Id.* ¶ 41.

On August 6, 2002, former Attorney General Ashcroft personally weighed in on the matter when he appeared on two television morning shows—CBS's "The Early Show" and NBC's "Today Show"—and proclaimed that Dr. Hatfill was "a person of interest" to the DOJ and FBI in the Amerithrax investigation. *Id.* ¶ 49. The

plaintiff argues that his designation by defendant Ashcroft as a "person of interest" and the other actions of federal officials implicating him in the anthrax mailings were direct violations of the Privacy Act and various government regulations. *Id.* ¶ 55–67. The plaintiff contends that he was then subjected to acts of retaliation by the defendants after making his first public statement on August 11, 2002, declaring his innocence and filing a formal complaint with the FBI and DOJ Offices of Professional Responsibility. *Id.* ¶¶ 68, 71. For example, Dr. Hatfill alleges that after he publicly denied his involvement in the anthrax mailings, government agents disclosed the draft of a novel he had written and that had been seized from his computer by the agents, which fictionalized a biomedical terrorist attack. *Id.* ¶ 75. Furthermore, government officials allegedly disclosed to Newsweek magazine and the New York Times newspaper "erroneous and prejudicial information" about the investigative procedures Dr. Hatfill had been subjected to and their purported results. *Id.* ¶ 77. Dr. Hatfill also alleges a series of continuing abuses by the defendants, as well as the failure of the DOJ and the FBI to properly investigate or control abuses, and the continued destruction of his personal and professional life. *Id.* ¶¶ 84–99. As a result of the defendants' actions, Dr. Hatfill alleges that his personal and constitutional freedoms and liberties have been violated.[3]

In this lawsuit, the plaintiff has filed a four count complaint against the defendants, wherein he alleges violations of the First and Fifth Amendments, the Privacy

---

**3.** As an example of the defendants' encroachment into his daily life, Dr. Hatfill alleges that on one occasion an FBI employee ran over his foot with the employee's car to prevent Dr. Hatfill from taking the employee's photograph. Compl. ¶ 97. Furthermore, on or about March 2003, Dr. Hatfill contends that

he attended a meeting with a prospective employer and encountered FBI agents who were videotaping the meeting. *Id.* ¶ 99. According to Dr. Hatfill, as a result of these actions, the prospective employer lost interest in hiring him. *Id.*

Act and DOJ regulations. The individual defendants—former Attorney General John Ashcroft, Van A. Harp, Timothy Beres and Daryl Darnell—have moved to dismiss Counts I, II, and IV of the complaint on the ground that Dr. Hatfill has failed to state claims upon which relief may be granted. In Count I of his complaint, the plaintiff alleges that the defendants' actions in connection with the anthrax mailings investigation have violated his Fifth Amendment right to due process and his property rights. Specifically, Dr. Hatfield alleges that public statements made by the defendants have prohibited him from obtaining employment in his field of expertise—research and training in biowarfare preparedness and countermeasures. Compl. ¶ 105.[4] Dr. Hatfill contends that because he had been hired specifically to perform these duties, defendants Beres' and Darnell's statements effectively caused his termination. *Id.* Furthermore, Dr. Hatfill alleges that "[p]ublic and private statements by DOJ and FBI officials defaming [him] in the anthrax attacks without evidence have prevented [him] from obtaining employment in his field of expertise ... [, a] field [that] consists almost entirely of government and government-funded jobs." *Id.* ¶ 105.

In Count II of his complaint, Dr. Hatfill alleges that the defendants have violated his First Amendment free speech rights and challenges government action which he contends sought to punish and retaliate against him for exercising his right to publicly disclaim any knowledge of the anthrax attacks. He therefore seeks redress for the government's alleged mishandling of the anthrax investigation. *Id.* ¶ 111.[5]

In both Counts I and II, Dr. Hatfill seeks monetary damages against each of the individual defendants in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and he also seeks injunctive and declaratory relief against these defendants in both their individual and official capacities. *Id.* ¶¶ 108, 112.

Finally, Dr. Hatfill alleges in Count IV that defendants Ashcroft's and Harp's actions violated DOJ regulations and he seeks injunctive and declaratory relief against these two defendants in both their individual and official capacities for these alleged violations. *Id.* ¶¶ 119–120.

## II. Analysis

### A. Standard of Review

The individual defendants have filed a motion to dismiss Counts I, II and IV of Dr. Hatfill's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. To survive a Rule 12(b)(6) dismissal motion, a complaint need only provide " 'a short and plain statement of the claim' that will give the

---

4. As already noted, of particular significance, Dr. Hatfill alleges that on August 1, 2002, defendant Darnell telephoned LSU personnel, where Dr. Hatfill was employed, and informed them that Dr. Hatfill could "not be employed on any DOJ-funded project." *Id.* ¶ 41. Defendant Beres allegedly confirmed this admonition when he subsequently sent an e-mail to Dr. Hatfill's supervisor to "reiterate" that LSU should "immediately cease and desist from utilizing the subject matter expert and course instructor duties of Steven J. Hatfill on all [DOJ] funded programs.' " *Id.* ¶ 42.

5. This retaliatory behavior challenged by Dr. Hatfill includes the defendants' increased surveillance of Dr. Hatfill, additional leaks of information about him, and in particular, displaying his single photo to residents in the Princeton, New Jersey area, with the hope that someone would identify Dr. Hatfill as being at the location of the anthrax mailings. Compl. ¶ 78.

defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citing Fed.R.Civ.P. 8(a)(2)). And, when reviewing a motion to dismiss, the court "must accept as true all the factual allegations [contained] in the complaint." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). "A motion to dismiss under Rule 12(b)(6) tests not whether a plaintiff will [ultimately] prevail on the merits ... [,]" but only whether the plaintiff has properly stated a claim for which he is entitled to relief. *Woodruff v. DiMario*, 197 F.R.D. 191, 193 (D.D.C.2000). Thus, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

## B. The Defendants' Arguments in Support of Dismissal

In support of their requests for dismissal of Counts I and II, the individual defendants advance several arguments. First, they allege that " '[s]pecial factors counseling hesitation' in creating a *Bivens* remedy for Dr. Hatfill [ ] [on these] claims exist." Memorandum of Points and Authorities in Support of Individual Defendants' Motion to Dismiss ("Defs.' Mem.") at 7. According to the individual defendants, these special factors include the remedial schemes created by the Privacy Act and the Administrative Procedures Act, and the fact that there is an ongoing criminal investigation of the anthrax mailings. *Id.* at 9–16.[6]

Moreover, the individual defendants contend that Count IV of the complaint should be dismissed because the DOJ's regulations do not create a "duty in favor of the general public, and there is no private cause of action for their violation." *Id.* at 45. The Court will address each of these arguments in turn.

## 1. Are there Special Factors Counseling Hesitation by the Court in Creating a *Bivens* Remedy for the Plaintiff?

In *Bivens*, the Supreme Court acknowledged the right of citizens to file claims for damages against federal law enforcement officials who violate their constitutional rights. *Bivens*, 403 U.S. at 389, 91 S.Ct. 1999. There, petitioner Bivens alleged he had been subjected to an unlawful search and seizure by federal agents in violation of the Fourth Amendment. *Id.* In reversing the District Court and the Second Circuit's affirmance of the dismissal of Biven's complaint on the ground that he had failed to state a cause of action, the Supreme Court held "[t]hat damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials...." *Id.* at 395, 91 S.Ct. 1999; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ("In *Bivens* ..., we recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."). However, the *Bivens* Court concluded that the case before it "involve[d] no special factors counseling hesitation [against providing a monetary remedy] in the absence of affirmative ac-

---

6. The individual defendants also argue that they are entitled to qualified immunity because Dr. Hatfill has failed to allege sufficient personal involvement by the named defendants and has not demonstrated that they violated any clearly established constitutional rights. *Id.* at 25–27. However, because the defendants' motion will be granted, the Court will not address the qualified immunity question.

tion by Congress." 403 U.S. at 396, 91 S.Ct. 1999. The Court emphasized that there was

> no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress. The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts.

*Id.* at 397, 91 S.Ct. 1999 (citations omitted). In line with this reasoning, in *Schweiker v. Chilicky*, 487 U.S. 412, 418, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Supreme Court refused to permit claimants, whose social security disability benefits had been terminated during disability reviews but later reinstated, to assert *Bivens* claims for alleged Fifth Amendment due process violations against state and federal officials "who had policymaking roles in the administration of the [continuing disability review] program...." *Id.* The Court concluded that Congress had created an adequate remedial scheme which "addressed the problems created by state agencies' wrongful termination of disability benefits." *Id.* at 429, 108 S.Ct. 2460. The fact that the claimants could not seek monetary damages for "emotional distress or for other hardships suffered because of delays in their receipt of Social Security benefits[,]" was deemed by the Court not to be a sufficient basis for permitting them to assert *Bivens* claims. *Id.*

at 425, 108 S.Ct. 2460. In this regard, the Court noted that even though Congress had not provided "complete relief," it had nonetheless "not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were." *Id.* The Court emphasized that it has "responded cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Id.* at 421, 108 S.Ct. 2460. And, the Court reiterated that "[t]he absence of statutory relief for a constitutional violation ... does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Id.* at 421–22, 108 S.Ct. 2460 (citations omitted). Thus, where "the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, [the Supreme Court has] not created additional *Bivens* remedies." *Id.* at 423, 108 S.Ct. 2460.

Relying on the Supreme Court's "special factors counseling hesitation" limitation on the applicability of *Bivens*, the individual defendants argue that such factors are implicated in this case because there are other congressionally created avenues available to Dr. Hatfill through which he can seek relief. Specifically, the defendants maintain that Dr. Hatfill can pursue redress through either the Privacy Act or the Administrative Procedures Act for the alleged violations of his Fifth and First Amendment rights. Defs.' Mem. at 9, 13. The defendants also maintain that the ongoing criminal investigation of the anthrax mailings merit the Court not affording Dr. Hatfill a *Bivens* remedy. *Id.* at 16.[7]

---

**7.** Although this Court has concerns about whether an ongoing criminal investigation is a special factor counselling hesitation, the Court will not address this question in light of

its conclusion that Dr. Hatfill's alleged Fifth Amendment violation can be redressed under the Privacy Act and its disposition of his First Amendment claim. Likewise, the Court will

### 2. Does the Privacy Act Provide the Plaintiff with a Sufficient Avenue for Redress?

The Privacy Act, 5 U.S.C. § 552a(g)(1)(C), provides that

whenever any agency ... (C) fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual ... [,] the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matter[ ] . . . .

The Privacy Act also precludes agencies from "disclos[ing] any record which is contained in a system of records *by any means of communication* to any person ... except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." 5 U.S.C. § 552(b) (emphasis added). If it is determined that the agency has willfully or intentionally violated the Act, the United States will be liable to a person for "(A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and (B) the costs of the action together with reasonable attorney fees . . . ." 5 U.S.C. § 552(g)(4).

The individual defendants contend that "[t]he Privacy Act is a special factor precluding Dr. Hatfill's First and Fifth Amendment claims based upon the leaks of information he alleges." Defs.' Mem. at

10. The defendants further contend that "[t]he Privacy Act ... regulates the collection, maintenance, use and dissemination of information concerning individuals." *Id.* (quoting *Downie v. City of Middleburg Heights*, 301 F.3d 688, 696 (6th Cir.2002) (other citation omitted)). In *Downie*, upon which the defendants rely, plaintiff Mickey Downie ("Downie") alleged that he was "blacklisted" and terminated from his employment in retaliation for refusing to continue to act as an "undercover operative" for the United States Customs Service. *Id.* at 690. In his letter of resignation, Downie expressly criticized the agency's investigatory methods, and he alleged that in retaliation for his resignation, Customs Service agent Siegel and Bureau of Alcohol, Tobacco and Firearms agent Schneider, along with other state officials, violated his constitutional and statutory rights. *Id.* at 689. Specifically, Downie alleged that agent Siegel and other government officials engaged in a "campaign to discredit [him]" by engaging in the following actions: (1) writing a "blackball" memo to the Officer of Domestic Operations for the Customs Service in which Siegel stated that Downie should not be hired "as a source of information for the Customs Service" because he was "both undesirable and unreliable[,]" *id.* at 690; (2) "caus[ing] Downie's federal firearms license to be revoked, illegally seiz[ing] Downie's firearm, and caus[ing] the entry of false records into the City of Middleburg Heights police files regarding an arrest of Downie for carrying a concealed weapon[,]" *id.* at 690–91; and (3) causing Downie and his assistant, David Wheat, to be fired from positions with a county narcotics task force by calling the county prosecutor and informing the prosecutor that unless he fired

---

not address the merits of the defendants' assertion that APA is also a special factor coun-

selling hesitation.

Downie, "federal officials would no longer work with [him]." *Id.* at 691. Downie and Wheat filed a civil complaint in federal district court alleging (1) "that the defendants had retaliated against them [for exercising] their First Amendment rights; (2) that the defendants [had] violated their rights under Ohio law; and (3) that the defendants conspired to deprive them of their constitutional and state-law rights." *Id.* at 691.

■ On appeal from the dismissal of Downie's claims, the Sixth Circuit "agree[d] with the district court that because the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy for the kind of wrong Downie allege[d] that he suffered, [it] should not imply a *Bivens* remedy for Downie against Siegel and Schneider directly under the First Amendment of the United States Constitution." *Id.* at 696. The Court noted that although several counts of the plaintiffs' complaint referred to "'actions' or 'acts' by the defendants, all three parts of Siegel's alleged 'campaign to discredit' Downie, as described in Downie's complaint, involved the creation, maintenance, or dissemination of false records on Downie." *Id.* at 696.[8] Furthermore, although recognizing that Congress had not "explicitly declare[d] the Privacy Act to be either a substitute for an action directly under the Constitution or an exclusive remedy[,]" the Court noted that such a requirement could not be found in Supreme Court precedent, and in the case before it, "the fact that the Privacy Act is a comprehensive legislative scheme that provides a meaningful remedy for the wrong Downie alleges is sufficient as a 'special factor[ ] counselling [sic] hesitation'

for us to refuse to imply a separate damages remedy under *Bivens*." *Id.* at 697.

In attempting to defeat the defendants' reliance on *Downie*, Dr. Hatfill contends that the defendants' characterization of his claims as involving only the dissemination of false information about him construes his complaint too narrowly. Plaintiff's Memorandum of Points and Authorities in Opposition to the Individual Defendants' Motion to Dismiss ("Pl.'s Opp'n") at 34. Rather, read broadly, plaintiff contends that

> Count I accuses the defendants of engaging in a coordinated campaign to deprive Dr. Hatfill of his job and render him unemployable in his field of chosen profession. Count II accuses the defendants of retaliation against Dr. Hatfill to intimidate, discredit, and punish him for exercising his First Amendment rights. Some of the acts by which these campaigns were carried out were illegal under the Privacy Act, while others were not.

*Id.* Because the plaintiff posits that all of the allegations cannot be read to state a claim pursuant to the Privacy Act, he opines that the Act does not preclude a *Bivens* remedy in this case. *Id.* at 36. In support of his argument that he can assert *Bivens* claims against the individual defendants, the plaintiff relies on *Bartel v. Federal Aviation Admin.*, 725 F.2d 1403 (D.C.Cir.1984), which he contends supports the conclusion that a *Bivens* action can be "based on the same defamatory government statements on which the plaintiff based his Privacy Act claim." Pl.'s Opp'n at 38 (citing *Bartel*, 725 F.2d at 1405). In *Bartel*, the District of Columbia Circuit indicated that the *pro se* plaintiff's due process claim against a Federal Aviation

---

8. Downie's counsel, at oral argument, also "conceded that Downie's complaint really only involved the creation, maintenance, and

dissemination of false records." *Downie,* 301 F.3d at 696.

Administration ("FAA") official pursuant to *Bivens* was not necessarily foreclosed by the plaintiff's Privacy Act claim. 725 F.2d at 1414. There, the plaintiff alleged that the FAA official had "intentionally den[ied] him due process when [the official] made and disclosed the 'determination' of wrongdoing ...," *id.*, by revealing that the plaintiff had obtained records belonging to his co-workers in violation of the Privacy Act. *Id.* As a result of the official's actions, the plaintiff alleged that his reputation had been injured and he had been denied several employment opportunities. *Id.* at 1406, 1414. The Circuit Court remanded the case to "the district court to ascertain whether conduct of FAA officials denied Bartel a legally recognized interest, and if so, whether he was given his procedural due." *Id.* at 1415. The disposition in *Bartel*—remand—does not unequivocally support the plaintiff's position that both Privacy Act and *Bivens* claims may be maintained when based on the same underlying acts. In fact, the Circuit Court specifically declined to address "Bartel's allegations [that his] due process allegations survive[d] the holding in *Bush [v. Lucas*, 462 U.S. 367, 388–89, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (holding that where a claim is governed by Congressionally created procedural and substantive provisions that provide meaningful remedies against federal officials, it is inappropriate for courts to supplement that regulatory scheme with a new non-statutory damages remedy pursuant to *Bivens.*)]." *Id.* at 1415 n. 21.

A case analogous to the present one is *Chung v. United States Dep't of Justice*, No. Civ.A. 00–1912, 2001 WL 34360430, at *1 (D.D.C. Sept.20, 2001) (Hogan, J.), *aff'd* in part, *rev'd* in part and remanded, 333 F.3d 273 (D.C.Cir.2003).[9] In *Chung*, the plaintiff had pled guilty to violating the Federal Election Campaign Act ("FECA") "by contributing approximately $400,000 toward Democratic Party politics from July 1994 through October 1996." *Id.* As part of his plea agreement, Chung cooperated with the government in its investigation of illegal campaign contributions by agreeing to serve as an undercover, confidential informant. *Id.* However, these intentions were dashed when the New York Times published a story regarding Chung's cooperation with the government. *Id.* Thereafter, Chung and his family had to be placed in protective custody, a fact that was reported by NBC News. *Id.* "Chung learned from a Los Angeles Times reporter that high-ranking DOJ officials in Washington, D.C. had leaked the information ... about his cooperation that was published in the New York Times." *Id.* (citation omitted). Chung thereafter filed a civil complaint asserting (1) that the DOJ violated the Privacy Act; (2) that five unknown DOJ officials violated his First Amendment rights to free speech, and (3) that the same unknown DOJ officials violated "his Fifth Amendment rights to be secure in his person." *Id.* at *2 (citation omitted). The two latter claims were brought pursuant to *Bivens*. *Id.* at *6. In dismissing Chung's *Bivens* claims against the unidentified DOJ officials, the District Court stated that "it is quite clear that Congress found constitutional implications and concerns respecting privacy matters as part of its reason for enacting the Privacy Act of 1974." *Id.* at *11. Thus, the

9. The Circuit Court of Appeals did not reverse the District Court's holding that Chung was precluded from bringing a *Bivens* action based on his Privacy Act claim; rather, the Court of Appeals only addressed the issue of whether equitable tolling was available under the Privacy Act and thus whether Chung could rely on this theory as a justification for the late filing of his claim. *Chung v. United States Dep't of Justice*, 333 F.3d 273 (D.C.Cir. 2003).

Court concluded that Chung's *Bivens* claims were foreclosed. Specifically, the Court held that because "all of the plaintiff's claims stem from the alleged leaks— namely, the allegedly wrongful disclosure of government records, ... the Privacy Act comprehensively covers such claims and accordingly has not inadvertently omitted damages remedies, and ... Congress has not plainly expressed an intention to preserve *Bivens* remedies." *Id.* at *12 (citations omitted). Therefore, the Court concluded that it would not "recognize a *Bivens* action for the plaintiff's constitutional claims...." *Id.*

In the present case, the plaintiff's First and Fifth Amendment related allegations in his complaint against the individual defendants are most analogous to the claims raised by the plaintiffs in *Downie* and *Chung*. Nonetheless, the plaintiff contends that these cases do not support the dismissal of these claims in their entirety, while conceding that they may "support a narrowing of those counts to preclude recovery for acts that are compensable under the Privacy Act." Pl.'s Opp'n at 39. Moreover, the plaintiff seeks to avoid the application of *Chung*, arguing that in that case "the district court found 'that all of plaintiff's claims stem from the alleged leaks ....'" whereas here, the plaintiff contends that "there is no provision in the Privacy Act that addresses retaliatory use of private information as a way to punish or chill protected speech or the use of 'defamatory information in conjunction with adverse employment action to squash the right to work.'" *Id.* at 37. However, *Downie* did specifically address the plaintiffs' claim that they "ha[d] been and continue[d] to be precluded from [employment in their chosen profession] as a direct result of the actions of the defendants ... [in] violat[ion of the] plaintiffs' constitutionally protected rights guaranteed under the First and Fourteenth amendments to

the U.S. Constitution," and concluded that this count of their complaint "allege[d] wrongs that could be addressed under the Privacy Act." *Downie*, 301 F.3d at 696. (citations omitted).

█ Here, Dr. Hatfill alleges that the statements made by DOJ employees violated his Fifth Amendment due process property rights. Specifically, it is Dr. Hatfill's position that his Fifth Amendment rights have been infringed as a result of the statement of former Attorney General Ashcroft labeling him as a person of interest in the anthrax investigation, and the instructions from defendants Beres and Darnell that prohibited him from working on any government funded projects. Compl. ¶¶ 41–42. Dr. Hatfill contends that these acts have deprived him of his employment and of the opportunity to gain any meaningful employment in his field of research and training in biowarfare preparedness and countermeasures. *Id.* ¶ 105. The defendants counter that any statements made by them were not defamatory, and therefore, the statements cannot form the basis for his defamation claim. Defs.' Mem. at 25. In response, Dr. Hatfill contends that "[t]he D.C. Circuit has recognized at least two distinct actions under the liberty component of the due process clause of the Fifth Amendment," one being a "reputation-plus" action, which requires the making of defamatory governmental statements "'in the course of the termination of employment.'" Pl.'s Opp'n at 6 (citing *O'Donnell v. Barry*, 148 F.3d 1126 (D.C.Cir.1998)). Dr. Hatfill notes that the second theory of liability is applicable "when 'adverse employment action and a stigma or disability ... [have] foreclosed [a plaintiff's] freedom to take advantage of other employment opportunities.'" *Id.* In any event, the plaintiff alleges that he can maintain a cause of action under both theories. *Id.*

To prove a reputation-plus claim under the Fifth Amendment, a plaintiff must establish that the defendants made defamatory statements and that such statements were accompanied by the loss of government employment. *O'Donnell*, 148 F.3d at 1140. In *Paul v. Davis*, 424 U.S. 693, 706, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court noted that it "has never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." For this reason, the Court dismissed the claims of a plaintiff who sued several state officials for defamation arising from the defendants' creation and circulation of a flyer listing the names of active shoplifters, which included the plaintiff's name. *Id.* at 695, 96 S.Ct. 1155. When those events occurred, the plaintiff had been arrested and charged with a shoplifting offense, "but his guilt or innocence of that offense had never been resolved." *Id.* at 696, 96 S.Ct. 1155. The information contained in the flyer about the plaintiff resulted in his supervisor informing the plaintiff "that although he would not be fired, he had best not find himself in a similar situation in the future." *Id.* Despite what had occurred, because the plaintiff did not contend he had suffered any loss of government employment as a result of the alleged defamatory statements, the Supreme Court held that "petitioners' defamatory publications, however seriously they may have harmed respondent's reputation did not deprive him of any 'liberty' or 'property' interests protected by the Due Process Clause." *Id.* at 712, 96 S.Ct. 1155. In this case, although Dr. Hatfill sustained the loss of employment, as defendants correctly note, the statements concerning Dr. Hatfill cannot be considered defamatory, as he has not alleged that the statements were false

when they were made. Defs.' Reply at 11. One element a plaintiff must establish to succeed on a defamation claim is proof that a defendant made a false *and* defamatory statement concerning the plaintiff. *See Croixland Properties P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C.Cir.1999). Although Dr. Hatfill maintains that he was not responsible for the anthrax attacks, he cannot demonstrate that the defendants did not consider him "a person of interest" in the anthrax mailings. Thus, Dr. Hatfill cannot pursue a claim based on the first theory of Fifth Amendment due process liability.

On the other hand, with respect to his second theory of Fifth Amendment due process liability, Dr. Hatfill has stated a viable claim. The District of Columbia Circuit has held "that government stigmatization that broadly precludes individuals or corporations from a chosen trade or business deprives them of liberty in violation of the Due Process Clause." *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C.Cir.2003). Thus, Dr. Hatfill's "stigma or disability" theory, applicable "when 'adverse employment action and a stigma or disability ... [have] foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities,'" Pl.'s Opp'n at 11 (citing *O'Donnell*, 148 F.3d at 1141), has been adequately demonstrated. However, this Fifth Amendment claim is strikingly similar to the plaintiffs' claim in *Downie* and likewise can be redressed under the Privacy Act. And the Privacy Act, being a comprehensive legislative scheme that provides a meaningful remedy for the kinds of harm Dr. Hatfill alleges he has suffered, qualifies it a special factor counselling hesitation against the applicability of *Bivens*. Therefore, this Court cannot imply a separate damages remedy under *Bivens* for Dr. Hatfill against the individu-

al defendants based on the alleged Fifth Amendment violations.

With respect to the First Amendment violation alleged by the plaintiff, the Court need not conduct a *Bivens* analysis, because as explained hereafter, *see infra* Part II.C, the plaintiff has failed to adequately state a claim upon which relief can be granted for such a violation.

### C. Has the Plaintiff Stated a First Amendment Violation?

Dr. Hatfill alleges that the individual defendants violated his First Amendment right to publicly protest the government's treatment of him when they

(a) conducted an extra search of [his] apartment ... (b) directed LSU to fire him ... (c) divulged private facts about him ... (d) attempted to manufacture unreliable evidence implicating him ... (e) intensified their "surveillance" to the point that it constituted harassment, ... (f) deliberately intimidated a prospective employer ... [and] (g) threatened to indict him for unrelated offenses....

in retaliation for the exercise of his First Amendment rights. Pl.'s Opp'n at 22–23. The plaintiff argues that "if the defendants did any of these things with the intention either of chilling Dr. Hatfill's exercise of First Amendment rights or punishing him for the occasions on which he exercised them, then Hatfill's complaint states a constitutional violation." *Id.* at 23.

It is true that if the defendants took their actions with intent to retaliate against Dr. Hatfill for exercising his First Amendment rights, such retaliatory action could be the basis for a First Amendment claim because it would "offend[ ] the Constitution [in] that it threatens to inhibit the exercise of the protected right." *Crawford–El v. Britton*, 523 U.S. 574, 589 n. 10, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (citation omitted). In *Kimberlin v. Quin-*

*lan,* 199 F.3d 496, 499 (D.C.Cir.2000), a former member of this Court had concluded that prison officials had violated the plaintiff's First Amendment rights to free speech by placing him in administrative segregation to preclude him from talking to the press concerning his allegations that he had sold marijuana to then vice-presidential candidate Dan Quayle. *Id.* at 498. On appeal, the *Kimberlin* Court noted that the District Court had already "found that no reasonable prison official could believe that interfering with an inmate's access to the press because of the content of the inmate's speech could be lawful." *Id.* at 503. Thus, the District Court had concluded that the plaintiff's First Amendment rights were clearly established at the time of the alleged violation. *Id.* Although, the District Court had not reached the conclusion that Kimberlin's First Amendment rights had been violated, after a series of appeals and remands, this case was ultimately remanded to the District Court "to determine if plaintiff could demonstrate that disputed facts exist[ed] as to whether defendants violated clearly established law, either by intentionally segregating plaintiff from the general prison population, or by interfering with plaintiff's ability to contact the press because of the content of his proposed speech." *Kimberlin v. Quinlan,* 251 F.Supp.2d 47, 48 (D.D.C.2003) (citing *Kimberlin,* 199 F.3d at 498). The District Court then concluded that it was "convinced that a reasonable jury could conclude that [prison officials] acted with improper motives in restricting plaintiff's access to the press and in placing him in administrative detention." *Id.* at 57. Thus, summary judgment was not appropriate. *Id.*

▮ To prevail on a First Amendment retaliation claim, a plaintiff must prove that "(1) he has an interest protected by the First Amendment; (2) defen-

dants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) (citation omitted). In this case, no one disputes the existence of the first element. And with respect to the second element of a First Amendment retaliation claim—that defendants' actions were motivated or substantially caused by his exercise of that right—the Court need not make this determination in light of its conclusion that Dr. Hatfill's speech was not "actually chilled." *Id.* (citing *Davis v. Vill. Park II Realty Co.,* 578 F.2d 461, 464 (2d Cir. 1978)). As the Supreme Court has held, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id.* (alteration in original) (quoting *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). Here, many of the actions challenged by Dr. Hatfill, allegedly committed with the intent to "chill" his First Amendment rights, were committed prior to his exercise of that right, namely, Dr. Hatfill's first public statement denying involvement in the anthrax mailings on August 11, 2002. Specifically, the second search of Dr. Hatfill's apartment was conducted on August 1, 2002. *See* Compl. ¶ 39. Additionally, the DOJ Personnel Order to LSU precluding Dr. Hatfill from working on DOJ funded projects occurred on or about August 1, 2002. *Id.* ¶¶ 41–44; and the naming of Dr. Hatfill as a "person of interest," *id.* ¶ 49, and the alleged "leaks to the media regarding the searches of Dr. Hatfill's apartment," *id.* ¶ 59, also occurred prior to August 11, 2002. As all of these events pre-date Dr. Hatfill's August 11 statement, they bear no relevance to Dr. Hatfill's First Amendment retaliation claim. All that remains then are Dr.

Hatfill's allegations of a "coordinated campaign of intimidation and harassment," and the allegations in the complaint concerning the government's purported attempts to "chill" Dr. Hatfill's First Amendment rights, which appear later in the complaint, beginning at paragraph 74 under the heading: "FBI and DOJ Personnel Retaliate Against Dr. Hatfill for Exercising His First Amendment Rights to Free Speech and to Petition His Government for Redress." *Id.* at 27. In this section of the complaint, Dr. Hatfill alleges that "the government stepped up its efforts to marginalize and discredit him." *Id.* ¶ 75. He also alleges that "in an effort to obtain any evidence adverse to [him] ... federal investigators began showing a single photo of [him] to residents in Princeton, New Jersey in the hope that someone would place him at the scene of the anthrax mailings." *Id.* ¶ 78. In addition, Dr. Hatfill alleges an increase in intensity of the defendants' surveillance of him. *Id.* ¶ 80. Thus, it appears that only the last section of the complaint, specifically paragraphs 74–81, are relevant to Dr. Hatfill's First Amendment retaliation claim.

■ "The widely accepted standard for assessing whether 'harassment for exercising the right of free speech [is] ... actionable' ... depends on whether the harassment is '[ ]likely to deter a person of ordinary firmness from that exercise.'" *Toolasprashad v. Bureau of Prisons,* 286 F.3d 576, 585 (D.C.Cir.2002) (citations omitted). In this case, it appears that Dr. Hatfill's free speech has not been chilled in any manner, as he has continued to protest the government's actions. Indeed, Dr. Hatfill has continued to fully exercise his First Amendment right to comment on the investigation and seek redress for alleged wrongs that have purportedly been committed in the course of the investiga-

tion. And "[w]here a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech." *Curley*, 268 F.3d at 73 (citing *Singer v. Fulton County Sheriff*, 63 F.3d 110, 120 (2d Cir.1995) (finding no chilling effect where, after an arrest, the plaintiff continued to publish his newspaper through which he criticized the village government); *Spear v. Town of W. Hartford*, 954 F.2d 63, 67 (2d Cir.1992) (finding no chilling effect where, after the filing of a lawsuit claiming retaliation for its editorial criticizing police handling of anti-abortion demonstrators, the plaintiff continued to write criticizing editorials in the same manner as before the lawsuit)). Here, Dr. Hatfill has continued to exercise his First Amendment rights subsequent to his first public statement. Accordingly, Dr. Hatfill, having failed to show that his First Amendment rights were *actually chilled*, has not stated a claim for which relief can be granted with respect to his First Amendment claim. Count II of the Complaint must therefore be dismissed.

**D. Count IV**

█ Finally, the individual defendants argue that the Court should dismiss Count IV of the plaintiff's complaint wherein the plaintiff charges that the defendants violated DOJ regulations prohibiting public disclosures concerning pending criminal investigations. Defs.' Mem. at 45. The plaintiff argues that "[t]here are good reasons to imply a right of action" under the regulations in this case, noting that he is unaware "of [any] authority forbidding such an implication...." Pl.'s Opp'n at 44. On the other hand, the defendants argue that this claim should be dismissed because "those regulations create no duty in favor of the general public, and there is no private cause of action for their violation." Defs.' Mem. at 45. In support of this argument the defendants cite *Kugel v.*

*United States*, 947 F.2d 1504, 1507 (D.C.Cir.1991). In *Kugel*, the plaintiff entered into contracts with twenty-one North Carolina cities wherein he agreed to development their respective downtown areas for a monthly management fee of $5000. *Id.* at 1506. As a result of this activity, the FBI launched an investigation into Kugel's activities. *Id.* During the course of the investigation, the FBI interviewed many parties to the various contracts. *Id.* Several North Carolina periodicals and a wire service printed articles about the investigation and the government's suggestion that Kugel had committed fraud or other fraudulent behavior. *Id.* Despite Kugel's clearance in the investigation, the North Carolina FBI office, upon request, sent a memorandum to the Baltimore FBI office repeating the allegations but neglected to mention that Kugel had been cleared. *Id.*

In response to the FBI's conduct, Kugel filed a civil action against the United States under the Federal Tort Claim Act, 28 U.S.C. § 1346(b) ("FTCA"), alleging that as a result of the FBI's negligent conduct during the course of its investigation, several North Carolina municipalities either cancelled their contacts with him, withheld their fee or filed lawsuits against him. *Kugel* 947 F.2d at 1506. Additionally, financial institutions refused to continue to do business with him and the subsequent losses forced him to file for bankruptcy. *Id.* He was also subjected to public ridicule and humiliation, which caused stress-related seizures that required medication and his hospitalization. *Id.* In an effort to establish the breach of a duty purportedly owed to him by the government, "Kugel relie[d] on *The Attorney General's Guidelines on Criminal Investigations of Individuals and Organizations* ('Guidelines') to establish the duty." *Id.* at 1507. This internal DOJ document re-

quired "agents [to] exercise minimal intrusiveness during an investigation to protect an investigative target from prosecution for improper reasons, from adverse consequences to privacy interests and from avoidable damage to reputation." *Id.* (citation omitted). Kugel argued that the Guidelines "created a duty owned him by [the FBI] and that [the FBI] breached that duty in [its] execution of the investigation." *Id.* However, the District of Columbia Circuit disagreed, stating that "[t]he Guidelines do not ... create a duty in favor of the general public." *Id.* (citing *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (holding that "intra-office manuals, unlike official regulations, have no legal force.")) Thus, "[b]ecause the internal manual did not create a legal duty, the court reasoned, its violation was not per se negligent and could not by itself support an FTCA claim." *Id.* (citing *Jacobo v. United States,* 853 F.2d 640, 641 (9th Cir.1988)); *see also Sloan v. Dep't of Hous. & Urban Dev.,* 231 F.3d 10, 18 (2000) (holding that Department of Housing and Urban Development ("HUD") employees' contravention of standards incorporated in HUD's Consolidated Audit Guide for Audits of HUD Programs did not support a claim for violation of due process).

The present case is distinguishable from *Kugel* because unlike the promulgation there—an "intra-office" manual—here we are dealing with a DOJ regulation. And it is "axiomatic that an agency must adhere to its own regulations ..., and that it need not adhere to mere 'general statement[s] of policy.'" *Brock v. Cathedral Bluffs Shale Oil Co.,* 796 F.2d 533, 536 (D.C.Cir. 1986) (alteration in original) (citations omitted). "Unfortunately [for Dr. Hatfill], there is no axiom to distinguish between regulations and general statements of policy." *Id.* at 536–37. And, Dr. Hatfill's position appears to be foreclosed by the Supreme Court's decision in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). There, the Supreme Court rejected the government's and the respondents' arguments "that ... regulations contain[ing] rights-creating language ... must be privately enforceable." *Id.* at 291, 121 S.Ct. 1511. The Court noted that while

[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.

*Id.* (citation omitted). Here, the regulation at issue, 28 C.F.R. § 50.2 (2003), is one of the DOJ's Statements of Policy pertaining to the release of information by DOJ personnel regarding criminal and civil proceedings. The purpose of this particular policy statement is "to formulate specific guidelines for the release of information by personnel of the Department of Justice." 28 C.F.R. § 50.2(a)(1). The Court has found no statute pursuant to which this regulation has been promulgated, and the plaintiff has not identified one. Thus, its adoption is not based upon a statute which provides for its private enforcement. .

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Sandoval,* 532 U.S. at 286, 121 S.Ct. 1511 (citation omitted). This Court's task is "to inter-

pret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* (citation omitted). Here, no such statute exists. Thus, without a specific intent expressed by Congress for a private right of action arising from the DOJ regulation, "a cause of action does not exist and [this] [C]ourt[ ] may not create one...." *Id.* at 286–87, 121 S.Ct. 1511. As noted, the regulation at issue is a policy statement promulgated by the DOJ formulating specific guidelines for the release of information by DOJ personnel about criminal and civil matters. Absent a clear indication of congressional intent to create a private right of action for the enforcement of this regulation, the Court can not impose one. Thus, Dr. Hatfill's argument that "[he] know[s] of no authority forbidding such an implication, and the purposes for which the regulation was promulgated would certainly be furthered by a private right of action ...," is not supported by any statutory authority. Nor has Dr. Hatfill presented any legal authority to support his position. Accordingly, Count IV of the complaint must be dismissed.

### E. Declaratory and Injunctive Relief

The defendants state that "the claims for injunctive and declaratory relief should also be dismissed because declaratory and injunctive relief are not available to the extent that Dr. Hatfill has an adequate remedy at law for those claims." Defs.' Mem. at 44. On the other hand, Dr. Hatfill correctly points out that a declaratory judgment may be granted whether or not further relief could be sought. Pl.'s Opp'n at 44 (citing 28 U.S.C. § 2201(a)). Moreover, as Dr. Hatfill notes, "district courts enjoy broad discretion in awarding injunc-

tive relief." *Id.* (citing *Wagner v. Taylor,* 836 F.2d 566, 575 (D.C.Cir.1987)).

Having concluded that Dr. Hatfill cannot maintain his First Amendment and DOJ regulation violation claims because in both instances he has failed to state claims upon which relief can be granted, he is not entitled to any relief—including injunctive and declaratory—on these claims. However, having stated a viable claim as to the alleged Fifth Amendment violation, Dr. Hatfill's demand for injunctive and declaratory relief survives the defendants' dismissal motion even though his demand for monetary relief does not. Accordingly, the defendants' motion to dismiss these forms of relief attendant to the alleged Fifth Amendment violation is denied.

### III. Conclusion

In conclusion, Dr. Hatfill has stated a viable claim for violation of his Fifth Amendment rights. Thus, his request for declaratory and injunctive relief as to this claim survives the defendants' motion for dismissal. However, Dr. Hatfill cannot maintain a *Bivens* action as to this claim because the allegations regarding this claim must be pursued solely pursuant to the Privacy Act. Moreover, the plaintiff has failed to state a claim against the individual defendants for a violation of the First Amendment and thus that claim must be dismissed in its entirety. Finally, the plaintiff's claim in Count IV must be dismissed, as there is no private right of action arising from the DOJ regulation upon which this count is predicated.[10]

---

10. A Order consistent with this Memorandum    Opinion will be filed contemporaneously